**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

WAYNE T. ELVIN,                          :
                                         :
                    Plaintiff,           :
                                         :
          v.                             :     C.A. No. 07-620-GMS-MPT
                                         :
MICHAEL J. ASTRUE, Commissioner of       :
Social Security,                         :
                                         :
                    Defendant.           :

**REPORT AND RECOMMENDATION**

**Introduction**

Wayne T. Elvin ("plaintiff") filed this action under 42 U.S.C. § 1383(c)(3) against

Michael J. Astrue, Commissioner of Social Security Administration ("defendant") on

October 10, 2007.  Plaintiff seeks judicial review under 42 U.S.C. § 405(g) of the final

decision denying plaintiff disability insurance benefits ("DIB") under Title II of the Social

Security Act ("Act").[1]  Currently before the court are the parties' cross motions for

summary judgment.

**Jurisdiction**

A district court has the jurisdiction to review an administrative law judge's ("ALJ")

decision in a Title II DIB case once it becomes the final decision of the Commissioner.[2]

A decision of the Commissioner becomes final when the Appeals Council either affirms

---

[1] *See* 42 U.S.C §§ 401-433.
[2] 42 U.S.C. § 405(g) ("Any individual, after any final decision of the
Commissioner of Social Security made after a hearing to which he was a party . . . may
obtain a review of such decision by a civil action . . . brought in the district court of the
United States for the judicial district in which the plaintiff resides.")

the ALJ's decision, denies review of an ALJ's decision, or when claimant fails to appeal the ALJ's decision within 60 days of unfavorable ruling.[3]

Here, ALJ's decision is the final decision of the Commissioner because the Appeals Counsel denied plaintiff's request for appeal.  Therefore, this court has jurisdiction to review the ALJ's decision.

**Procedural Background**

Plaintiff applied for DIB on December 7, 2004, asserting a disability onset date of March 20, 2001 and citing rheumatoid arthritis and fatigue as alleged causes of his disability.  Plaintiff's DIB insurance coverage expired on December 31, 2001.

The Social Security Administration denied his claim initially and upon re-consideration.  Subsequently, plaintiff requested a hearing before an ALJ.

The ALJ held a video hearing[4] on March 23, 2006, and plaintiff, represented by counsel, testified.  An impartial Vocational Expert ("VE"), Tony Melanson, was present throughout the hearing and also testified.

The ALJ found on April 10, 2007, based on the hearing testimony and the record, that plaintiff is not disabled within the meaning of the Act[5] and, therefore, not eligible for DIB.  Plaintiff appealed and subsequently, the Appeals Council denied plaintiff's request to review the ALJ's decision.  Thereafter, plaintiff brought the present action seeking judicial review of the ALJ's final decision.

**Background**

---

[3] *See* 20 C.F.R. § 416.1455;*see also* 20 C.F.R. § 404.905.
[4] *See* 20 C.F.R. § 404.936©.
[5] *See* 20 C.F.R. § 404.1520(a) and (g).

2

Plaintiff was 57 years old in 2001, the date of last coverage.  He owns a townhouse, where he resides with his wife, a nurse.  Plaintiff is college educated and had some specialized training in the area of computer hardware/software service and sales.  He was employed for 30 years as a technical consultant and salesperson in the area of computer systems.  Plaintiff stopped working full-time in June 2000. The record indicates that he worked as a part-time, freelance consultant for some time after leaving full-time employment.

**Medical Evidence**[6]

The medical evidence herein only spans a period of eight months, from March 20, 2001 to December 31, 2001, the period from alleged onset of disability through the date of last insured.[7]

On March 14, 2001, Dr. Russell J. Labowitz, examined plaintiff.  He addressed his findings in a March 20, 2001 letter to Dr. Charles Esham, plaintiff's long time treating physician.  Dr. Esham referred plaintiff to Dr. Labowitz after an office visit in February 2001.  At that time, plaintiff complained of pain and stiffness in his feet, swelling in his right ankle and fatigue.  RA factor blood test was positive with a sedimentation rate of 10.  His Lyme serology test was negative and his TSH level was normal.  His serum uric acid level was 4.4.  Dr. Esham prescribed Relafen, which provided no relief from the

---

[6] All facts and medical information referenced herein are found in D.I. 8, 13, 15 and 17.

[7] Plaintiff must establish that the disability started on or before the date of DIB insurance expiration.  *See* 42 U.S.C. § 405(g).  The evidence regarding disability must relate to the time period in question and does not concern evidence of a later-acquired disability or subsequent deterioration of a previously non-disabling condition.  *See Szubak v. Secretary of Health and Human Services*, 745 F.2d 831, 833 (3d Cir. 1984).

pain, and subsequently, plaintiff was given a Medrol Dose Pack.  That mediation helped, but the symptoms returned.  Thereafter, plaintiff was started on a steroid, Prednisone 40 mg. daily, which relieved the symptoms.  Prednisone was subsequently reduced to 10 mg. per day.  During his examination, Dr. Labowitz recorded that plaintiff had a history of intermittent back pain and articular pain which was relieved with over-the-counter NSAIDs and through chiropractic treatment.  In the history, Dr. Labowitz noted that plaintiff was recently married and works part-time with a publishing company doing advertising sales.

Dr. Labowitz's examination revealed that plaintiff's peripheral joints were "entirely normal."  Furthermore, he found no active sinovitis, no palpable nodules, and no tenderness of the SI joints.  His axial skeleton and neurologic examinations were normal.  All joints exhibited full range of motion.  Dr. Labowitz concluded that plaintiff "probably had rheumatoid arthritis, which was under good control with the present Prednisone dose."  Because plaintiff was anxious to stop taking a steroid, Dr. Labowitz prescribed Asulfidine 1 mg., and suggested that weaning off the Prednisone could occur within four to six weeks.  Thereafter, Dr. Philip Schwartz of Rheumatology Consultants continued seeing plaintiff for symptoms related to rheumatoid arthritis.  On April 30, 2001, he recorded that plaintiff complained of pain in his feet and ankles.  He continued Prednisone and also prescribed Celebrex.

On May 31, 2001, plaintiff complained of severe right ankle swelling and pain.  An ankle fluid test was administered, and Dr. Schwartz opined that plaintiff had rheumatoid arthritis.

On September 18, 2001, Dr. Schwartz recorded that plaintiff continued to

4

experience pain, swelling and fatigue; that Ibuprofen relieved the pain; and that Prednisone was continued.  Dr. Schwartz prescribed Vioxx 25 mg. and Arava  20 mg. daily.

On August 6, 2001, Dr. Schwartz reduced the Prednisone dosage to 5 mg. Thereafter, on August 9, 2001, he noted that plaintiff's symptoms of pain increased and lasted for longer periods of time, along with increased fatigue.

On September 13, 2001, bilateral x-rays of the wrists and hands were obtained. Mild arthritic changes in the form of narrowing of the radiocarpal joint space and mild spur formation in the distal radio ulnar joints were noted involving the wrists bilaterally. No significant arthritic changes were found in the hands.

On September 28, 2001, Dr. Schwartz increased Vioxx to 50 mg. and Prednisone to 10 mg.

Dr. Esham simultaneously oversaw the progression of plaintiff's symptoms.  He noted on April 23, 2001, that plaintiff's right foot bothered him everyday and he experienced severe pain at night.  He prescribed Prednisone 20 mg. and recommended daily hot baths.

On May 23, 2001, Dr. Esham recorded that Dr. Labowitz administered a cortisone shot, which helped relieve the pain for a day.  He also noted that plaintiff was taking Prednisone occasionally and Celebrex daily.  He referred plaintiff to a podiatrist, Dr. Soy. Dr. Esham further noted edema which encompassed the entire right foot and ankle.  He diagnosed second degree rheumatoid arthritis in the right foot.

On June 14, 2001, Dr. Esham recorded that plaintiff complained of increased pain in the right ankle.  Plaintiff also reported increased fatigue and difficulty getting out of

5

bed after he started taking Prednisone daily.  Upon examination, Dr. Esham noted neck

stiffness and shoulder pain with no proximal weakness.  Finger movement was

satisfactory.  Plaintiff's right wrist was swollen with a range of motion limitation of 60°

flexion and 45° extension.  Dr. Esham also noted that plaintiff experienced pain on

pronation/supination.  Dr. Esham assessed plaintiff as having rheumatoid arthritis, and

recommended to continue Prednisone.

On June 20, 2001, Dr. Esham recorded that plaintiff was taking Prednisone 20

mg. daily and was being treated by Dr. Schwartz.

On June 27, 2001, Dr. Esham reported an improvement in plaintiff's symptoms.

Plaintiff advised that he returned to his normal daily routine.  Because he found mild

involvement in the right foot, Dr. Esham recommended a bone density scan.

On September 6, 2001, Dr Esham renewed plaintiff's prescription for Prednisone.

Because of the side affects and lack of symptom control, Aravan was discontinued and

Enbrel was prescribed on September 26, 2001.  At that time, Prednisone was reduced to

5-10 mg. daily from 15-20 mg. daily.  The symptoms, however, recurred.  As a result of

his examination of plaintiff in which Dr. Esham noted swollen wrists, difficulty moving,

and second degree arthritic stiffness, he increased Prednisone to 15 mg. and

discontinued Vioxx.  Dr. Esham also recommended an urgent appointment with Dr.

Rhemn.

In a March 8, 2007 letter to plaintiff's counsel, Dr. Esham described plaintiff's

condition during the eligibility period.  Dr. Esham noted that he was plaintiff's primary

care physician since August 2000.  Plaintiff complained of pain in the balls of his feet in

December 2000.  In February 2001, plaintiff complained of severe pain in his right ankle,

left metatarsals, right knee, and left elbow and shoulder, accompanied by severe fatigue of continuous duration. On examination, tenderness in the left lateral epicondyle and a slightly swollen ankle were noted. X-rays of plaintiffs feet were normal, however, his rheumatoid factor was elevated. NSAIDs provided little relief and on March 2, a course of steroids was started and plaintiff was referred to Dr. Labowitz. Subsequently, the steroid dosage was increased. Dr. Labowitz noted slight swelling in the right foot and tenderness in the dorsal area. He initially prescribed Azulfidine, which did not relieve the symptoms, and Celebrex was prescribed. Plaintiff was also continued on Prednisone 20 mg. Because the arthritis pain worsened, Abraxa was prescribed, which was soon replaced with Enbrel. Plaintiff remained dependent on Prednisone 20 mg. for pain control. He was subsequently treated by Dr. Schwartz and did not return to Dr. Esham until July 2002.

Dr. Esham thus opined that plaintiff's condition severely deteriorated between August 2000 and the end of 2001. He noted that plaintiff experienced joint pain, fatigue, weakness, reactive depression, poor concentration, limited range of motion, and the side effects from the medication. Dr. Esham concluded that plaintiff would not be a reliable employee because his occasional good days could be suddenly interrupted and be replaced with bad days of increasing incapacity.

**Residual Functional Capacity Assessments**

The record contains two conflicting residual functional capacity ("RFC") evaluations: one was completed by a DDS[8] medical consultant and the second one was

---

[8] The Disability Determination Services ("DDS") is a state administered federal program that serves Delawareans who are unable to work because of a disability. The

performed by Dr. Esham.

On February 18, 2005, a DDS medical consultant prepared an RFC evaluation. Relying on the medical evidence that preceded the date of last coverage, that consultant determined that plaintiff could lift 50 pounds occasionally and 25 pounds frequently.  He also found that plaintiff could stand/walk (with normal breaks) for six hours and sit (with normal breaks) for about six hours during an eight hour workday.  He further concluded that plaintiff could unlimitedly push/pull (including operation of hand and foot controls). The DDS medical consultant opined that to prevent exacerbation of symptoms, plaintiff should avoid concentrated exposure to extreme cold and vibration.  The consultant could not establish any postural, manipulative (reaching, handling, fingering, feeling), visual and communicative limitations.  Consultant stated that plaintiff's symptoms were attributable to a medically determinable impairment, but noted that the severity and duration of symptoms were partially disproportionate to the expected severity and duration of plaintiff's impairments.  The medical consultant found that the severity and the alleged functional effects were only partially consistent with the medical and non-medical evidence.  Plaintiff's treating doctor's conclusions statements regarding his physical capacities were not available at the time of this review, however, the record contained medical evidence for the period in question.  The medical consultant based his determination on plaintiff's pain questionnaire, the ADLs[9] and the medical reports of 3/20/2001, 2/28/2002, 9/13/2002.  He concluded that the medical evidence and the

_____

DDS develops, adjudicates, and processes disability claims of residents for Social Security disability benefits.

[9] "ADL" stands for "Activities of Daily Living."

ADLs partially discredit plaintiff's claim that he could not perform any work during the period in question.  He determined that plaintiff's RFC precluded him from performing heavy[10] work.

Subsequently, on May 10, 2005, Dr. Esham completed an RFC assessment of plaintiff.  He diagnosed plaintiff as suffering from rheumatoid arthritis and coronary artery disease.  He concluded that plaintiff could not perform sedentary[11] work before December 2001 due to significant pain and fatigue from rheumatoid arthritis.  Dr. Esham noted that plaintiff could not work on a consistent basis.  He further concluded that plaintiff could not lift or carry any weight, would only be able to stand/walk for 5-10 minutes at a time, for a total time of one hour during an eight hour workday, sit for up to one hour at a time for a total of three hours during an eight hour workday, and that a sit/stand option would only allow plaintiff to remain at a workstation for less than one hour per day.  Dr. Esham further opined that plaintiff needed to lay down for more than two hours per day and therefore, he required 15-30 minute breaks every hour.  Dr. Esham concluded that plaintiff could rarely twist and stoop, never climb ladders, and rarely climb steps; but, he could occasionally reach, handle, finger and push/pull.  He explained that joint stiffness made plaintiff an unreliable employee.  He concluded that

_____

[10] "Heavy work" is defined as lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds.  If one can perform heavy work, then that individual can also do medium, light, and sedentary work. *See* 20 CFR 404.1567(d).

[11] "Sedentary work" involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary completing job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. *See* 20 CFR 404.1567(a).

plaintiff suffered from moderate side effects of the medication and that his pain, attributable to a medically determinable impairment, is moderate to severe, which would cause him to miss work more than 15 days a month and be tardy/leave work early 5-10 days a month.  Dr. Esham found no contributory emotional factors and did not identify any psychological conditions which affected plaintiff.  Thus, depression was not identified on Esham's RFC evaluation.  Dr. Esham pointed to the objective medical data, such as, laboratory findings and x-ray results, to support his conclusions.

**Psychiatric Review Technique Form**

The Social Security Administration attempted to have a psychiatric evaluation of plaintiff performed on March 1, 2005.  The DDS physician, however, concluded that the since there was no evidence of a psychiatric condition prior to the date of last insured, there was insufficient data to perform such an evaluation.

**Plaintiff's Subjective Accounts of Pain**

Plaintiff submitted a Personal Pain Questionnaire to Social Security on February 3, 2005, in which he stated that "pain varies daily in severity with joint swelling and fatigue in toes, feet, knees, fingers, hands and shoulder/neck."  Plaintiff reported that he primarily experienced dull pain, with occasional sharp pain which radiates to his joints. Movement exacerbates its severity, but the pain also increases without an obvious cause.  Plaintiff related that his daily medications are Prednisone 10 mg., Arava 10 mg., and Methotrexate 2.5 mg.  Hot baths provide temporary relief.  Plaintiff claimed that pain and fatigue severely interfere with performing simple activities.  Plaintiff stated that his walking, driving, and computer use are significantly restricted.  He contended that he can

no longer work with his hands, and his activities are further limited due to fatigue. Because pain significantly interferes with sleep, plaintiff claimed that he requires daily naps and additional bed rest.

**Activities of Daily Living Questionnaire**

Plaintiff submitted a Adult Function Report to the Delaware Disability Determination Service on February 3, 2005.  Therein, he reported that he usually awakens between four and five a.m. after five hours of uninterrupted sleep, uses the bathroom unassisted and returns to bed.  When he cannot sleep, he watches TV, reads the paper and drinks Ensure for breakfast.  On bad days, he stays in bed, rests, naps and watches TV.  In the afternoon, he usually has a prepared lunch or makes his own. Afterwards, he takes a two hour nap and watches more TV.  He spends evenings with his wife.  She prepares dinner and plaintiff helps with after-dinner cleanup.  Plaintiff stated that he often goes to bed after dinner around seven p.m. and watches TV until he falls asleep.  If the pain is severe, he retires earlier.

Plaintiff stated that he occasionally babysits his three year old grandson and assists in changing, dressing and feeding him.  He rarely assists in caring for the cats or maintaining the fish aquarium.

Plaintiff claimed that his wife provides primary assistance with daily living, however, he does tasks around the house when his wife is unavailable.  He confirmed that he dresses unassisted, but slowly with some limitations; bathes less often, because of difficulty getting in and out of the bathtub; shaves once a week, and is able to feed himself and use the restroom unassisted.  Due to fatigue and pain, he is uninterested in personal appearance.  He does not prepare meals.  Plaintiff reported that fatigue often

11

affects his memory, and at times, he needs to be reminded to take his medicine. Before the onset of his illness and pain, plaintiff claimed that he lived a normal existence.  He enjoyed going to flea markets and auctions, but now limits that activity to twice a month.  He does a light laundry load every two weeks; does not do any yard work; and employs a cleaning person on a bi-weekly basis.

Plaintiff goes outside on a limited basis.  When necessary, he drives to the store and purchases a small quantity of groceries and medications.  Otherwise his wife performs those tasks.  Plaintiff admitted to being able to pay bills, handle a savings account and use a checkbook.

Plaintiff maintains that he cannot walk more than four blocks.  He also reported that he visits his next door neighbor frequently and emails family almost daily.  He does not require reminders to go places, and occasionally needs a companion.  He claims that his social behavior did not change since the onset of his illness.

According to plaintiff, his illness affects his ability to lift (limited to 3-5 pounds), squat, bend, stand, walk, sit, kneel, and climb stairs.  Fatigue affects his memory.  He has trouble completing tasks and has difficulty concentrating.  Plaintiff reiterated that he can only walk a few hundred yards, and must rest afterwards for 15 minutes to several hours depending on the level of fatigue and pain in his knees and feet.  He claimed that he has no problem following written directions, or verbal instructions, but when fatigued he often needs clarification.

He described his symptoms as a "roller coaster" of unpredictable severe pain and debilitating fatigue.

**The Administrative Law Hearing**

    **Plaintiff's Testimony**

Plaintiff testified that his symptoms (pain primarily in the balls of his feet, ankles and shoulder) worsened significantly by March 20, 2001, forcing him to seek additional medical assistance, which lead to Dr. Labowitz.  Previously, he was unsuccessfully treated by a chiropractor.  During that treatment, his condition worsened and spread to his hands and knees.  Dr. Labowitz diagnosed rheumatoid arthritis.

Further, according to plaintiff, by mid-March 2001, the fatigue became incapacitating.  He was unable to physically renovate his new townhouse.  Plaintiff noted that fatigue was the primary problem, rather than pain.

Plaintiff described the pain as a "roller-coaster ride in terms of how it varied day-by-day and even sometimes during the day."  According to plaintiff, opening a milk carton or a soda can presented challenges and required the use of levers, like a knife, or help from his wife.

Plaintiff testified that he was prescribed NSAIDs initially, and followed that course of treatment for the first twelve weeks.  Thereafter, Prednisone was prescribed in varying dosages.  Prednisone reduced joint swelling, energized him, and made him hungry.  It did not provide consistent relief.  Other pain medications upset his stomach and they were discontinued.  Hot baths relieved severe stiffness, and he has to maneuver to get in and out of the bathtub.

Plaintiff further testified that he experiences symptoms daily, and has not been symptom free for a period of a month since onset of rheumatoid arthritis.  At times,

severe pain will incapacitate him.  On his bad days, he rarely leaves the bed, usually does not leave home, and avoids any strenuous activity or socializing, including talking on the telephone.  On those days, he does not dress and avoids stairs.

According to plaintiff, he experiences fatigue four to five days a week.  Plaintiff feels that fatigue is the most debilitating part of his illness, affecting his intellect to the point that he has difficulty talking or remembering directions.  Naps during the day help.

Plaintiff testified that he can sit, but has difficulty rising from a chair.  During the hearing, he denied severe pain.  Standing is problematic because of bilateral knee pain, and he can only stand without support for about 15 minutes, walk short distances and limitedly climb stairs.  Walking severely fatigues him.

Although plaintiff confirmed that he could bend at the waist and pick up items from the floor, he proceeds cautiously to guard against back pain.  He can lift eight to ten pounds comfortably, but stiffness in the wrists make gripping and handling difficult. Pouring a glass of milk was hard.

Plaintiff admitted that he could do light cleaning of kitchen surfaces, but could not vacuum, sweep or dust.  He further confirmed that he occasionally cared for his grandchild.  He can drive short distances to pick up his medication, however, his wife did the grocery shopping.  He enjoys auctions and flea markets, but claimed that he has curtailed those hobbies due to pain and fatigue.

According to plaintiff, absent the rheumatoid arthritis, he would be employed.  He stated that he is not a reliable employee, and would miss work because of the pain, fatigue and stiffness.

Plaintiff testified that the rheumatoid arthritis has progressed in that he could lift

14

twenty pounds, stand longer and walk further distances in 2001.  Fatigue is the primary

problem.  Further, plaintiff claimed that he had no problems with his hands in 2001, but

difficulties arose by 2002 as his condition rapidly worsened.

Plaintiff stated that he drinks a glass or two of wine a night to alleviate symptoms.

He has never been hospitalized for rheumatoid arthritis.

Plaintiff never mentioned depression or any symptoms related thereto during the

hearing.

### Vocational Evidence

During the hearing, plaintiff's counsel made the following comment regarding the

RFC of his client:[12]

> [P]art of it will come down to whether the Court finds that he's
> limited to unskilled work in the period of time in 2001. . . based on his
> testimony and the information provided by his doctors, that the fatigue and
> the pain would've limited him to unskilled work since that time . . . I believe
> that the vocational expert will describe his past work as light by DOT and
> skilled probably based on what I found.  So if he is limited to unskilled, light
> work in the Court's opinion, he would still be disabled according to medical
> vocational rule 202.06.

On questioning by the ALJ, the VE described the exertional requirements and skill

level of plaintiff's prior jobs based on his testimony of past work experience, which the

VE identified at the SVP 7 or 8 level, consistent with the DOT[13] criteria, which places

plaintiff's prior work level as light to medium.

When questioned by the ALJ regarding transferrable skills, the VE responded that

---

[12] The comment occurred after plaintiff testified and the presence of the VE, but
before the VE was sworn.

[13] DOT stands for Dictionary of Occupational Titles.

such skills included plaintiff's knowledge of computer systems and sales techniques. The VE concluded that plaintiff could transfer his skills to a sedentary position in sales or consumer service, which involve using a computer and communicating by telephone. VE identified 750 telephone sales jobs available in the local region with 95,000 such positions available nationally. VE also identified 300 positions locally in computer industry retail sales, with 60,000 like jobs nationally. VE described both occupations as sedentary, semi-skilled positions. A telephone sales job is at the SVP 3 or 4 level, while retail sales employment is a SVP 4. VE testified that both positions were consistent with the DOT criteria.

ALJ inquired about the adjustment period necessary to transfer plaintiff's skills to the identified available jobs, to which the VE answered that the adjustment period would be within 30 to 45 days.

In response to plaintiff's counsel's inquiry of whether plaintiff could perform his past position as described in his testimony and in DOT if he was limited to light duty, unskilled work, the VE testified that plaintiff would not be able to perform his past employment. On further questioning by counsel, the VE also confirmed that plaintiff could not perform the jobs that the VE identified if he were limited to an unskilled position. Moreover, when taking into account the limitations of rheumatoid arthritis as described by plaintiff as occurring two days a week, which required bed rest, limited standing and sitting, and caused problems concentrating, the VE concluded that plaintiff could not do the jobs that he proposed, nor perform any work in the national economy. The VE further testified that based on the degree of fatigue described by plaintiff, he could not perform any jobs in the national economy. Regarding the number of jobs

16

available to plaintiff based on Dr. Esham's RFC assessment, the VE answered in the

negative.

**ALJ's Decision**

In his detailed decision regarding plaintiff's claim for SSI on April 10, 2007, the

ALJ concluded as follows:

1.  The claimant last met the insured status requirements of the Social Security Act on December 31, 2001.

2.  The claimant did not engage in any substantial gainful activity during the period from his alleged onset date of March 20, 2001 through the date of last insured on December 30, 2001.

3.  Through the date of last insured, the claimant had the following severe impairments:  rheumatoid arthritis and depression (20 CFR 404.1520©). These impairments are severe in that they cause significant vocationally relevant limitations.

4.  Through the date of last insured, the claimant did not have any impairment or combination of impairments that meet or medically equated one of the impairments listed in 20 CFR Part 404, Subpart P, Appendix 1. (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.  The undersigned found that claimant's subjective statements as to intensity, persistence and limiting effects of pain are not entirely credible.

6.  After careful consideration of the entire record, the undersigned finds that, through the date of last insured, the claimant had a residual functional capacity to lift and/or carry up to twenty pounds occasionally and ten pounds frequently; stand and/or walk six hours overall in an eight hour workday for periods up to one hour; and sit up to six hours overall in an eight hour workday.  He is limited nonexertionally in that he must avoid concentrated exposure to extreme cold and vibrations.

7.  Through the date of last insured, the claimant is unable to perform any past relevant work.

8.  Claimant was an individual of advanced age on the date of last insured.

9.  Claimant has at least a high school education and is able to communicate in English.

10.  Claimant has acquired work skills from his past relevant work.

11.  Through the date of last insured, considering the claimant's age, education, work experience, and residual functional capacity, the claimant has acquired work skills from past relevant work that were transferrable to other occupations with jobs existing in significant numbers in the national economy.
        The vocational expert was asked whether there were occupations that could be performed by an individual having the same age, education,

past relevant work experience, and residual functional capacity as claimant had through last insured.  The vocational expert responded in the affirmative.

Although the claimant's additional limitations did not allow the claimant to perform the full range of light work, considering the claimant's age, education and transferrable work skills, a finding of "not disabled" is appropriate under the framework of Medical-Vocational Rule 202.07 12.  The claimant was not under a disability as defined in the Social Security Act, at any time from June 23, 2000, the alleged onset date, through December 31, 2001, the date of last insured.

**Standard of Review**

This court's review is limited to determining whether the final decision of the

Commissioner is supported by substantial evidence.

Substantial evidence is less than preponderance but more than a mere scintilla.  It is such relevant evidence as a reasonable mind would accept as adequate support for conclusion.  It must do more than create a suspicion of the existence of a fact to be established . . . it must be enough to justify, if the trial were put to a jury, a refusal to direct a verdict when the conclusion sought to drawn from it is one of fact to the jury.[14]

The Supreme Court has embraced a similar standard for determining summary

judgment pursuant to Fed. R. Civ. P. 56:

The inquiry performed is the threshold inquiry of determining whether there is a need for a trial–whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.
This standard mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a), which is that the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict.  If reasonable minds could differ as to the import of evidence, however, a verdict should not be directed. [15]

Overall, this test is differential and this court must give deference to agency inferences from facts if those inferences are supported by substantial evidence, even where a court acting *de novo* might have

---

[14] *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951).
[15] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-51 (1986).

reached a different result.

Furthermore, evidence taken as a whole must be sufficient to support a conclusion by a reasonable person, not just the evidence consistent with agency's decision.

Thus, a single piece of evidence will not satisfy the substantiality test if the [Commissioner] ignores, or fails to resolve, a conflict created by countervailing evidence. Nor is the evidence substantial if it is overwhelmed by other evidence – particularly certain types of evidence (e.g. that offered by treating physicians) – or if it really constitutes not evidence but a mere conclusion.[16]

Where, for example, countervailing evidence consists primarily of the claimant's subjective complaints of disabling pain, the ALJ "must consider the subjective pain and specify his reasons for rejecting these claims and support his conclusion with medical evidence in the record."[17]

Cross-motions for summary judgment are no more than a claim by each side that it alone is entitled to summary judgment, and the making of such inherently contradictory claims does not constitute an agreement that if one is rejected the other is necessarily justified or that the losing party waives judicial consideration and a determination whether genuine issues of material fact exist.[18]

Moreover, "[t]he filing of cross-motions for summary judgment does not require the court to grant summary judgment for either party."[19]

**Disability Determination Standard**

The Supplemental Social Security Income (SSI) program was enacted in 1972 to assist "individuals who have attained the age of 65 or are blind or disabled" by setting a

---

[16] *Monsour Med. Ctr. v . Heckler*, 806 F.2d 1185, 1190 (3d Cir. 1986).
[17] *Matullo v. Brown*, 926 F.2d 240, 245 (3d Cir. 1990)
[18] *Rains v. Cascade Indus., Inc.*, 402 F.2d 241, 245 (3d Cir. 1968).
[19] *Krups v. New Castle County*, 732 F. Supp. 497, 505 (D. Del. 1990).

minimum income level for qualified individuals.[20]  A claimant – in order to establish SSI

eligibility – bears the burden of proving that he is unable to "engage in any substantial

gainful activity by reason of any medically determinable physical or mental impairment

which can be expected to result in death or which has lasted or can be expected to last

for a continuous period of or not less than twelve months."[21]  Moreover, "the physical or

mental impairment or impairments must be of such severity that the claimant is not only

unable to do his previous work but cannot, considering his age, education, and work

experience, engage in any other kind of substantial gainful work which exists in

significant numbers in the national economy."[22]  Furthermore, a "physical or mental

impairment" is an impairment that results from anatomical, physiological, or

psychological abnormalities which are evidenced by medically acceptable clinical and

laboratory diagnostic techniques.[23]

**Five-Step Test.**

The Social Security Administration uses a five-step sequential claim evaluation

process to determine whether an individual is disabled.[24]

> In step one, the Commissioner must determine whether the
> claimant is currently engaging in substantial gainful activity.  If a claimant is
> found to be engaged in substantial activity, the disability claim will be
> denied.
> In step two, the Commissioner must determine whether the claimant

---

[20] *See Sullivan v. Zebley*, 493 U.S. 521, 524 (1990) (citing 42 U.S.C. § 1381
(1982 ed.)).
[21] 42 U.S.C. § 423(d)(1)(A).
[22] 42 U.S.C. § 423(d)(2)(A).
[23] 42 U.S.C. § 423(d)(3).
[24] *See* 20 C.F.R. §416.920(a); *see also Plummer v. Apfel*, 186 F.3d 422 (3d Cir.
1999).

is suffering from a severe impairment.  If the claimant fails to show that her impairments are "severe", she is ineligible for disability benefits.
In step three, the Commissioner compares the medical evidence of the claimant's impairment to a list of impairments presumed severe enough to preclude any gainful work.  If a claimant does not suffer from a listed impairment or its equivalent, the analysis proceeds to steps four and five. Step four requires the ALJ to consider whether the claimant retains the residual functional capacity to perform her past relevant work.  The claimant bears the burden of demonstrating an inability to return to her past relevant work.  If the claimant is unable to resume her former occupation, the evaluation moves to the final step.

At this stage, the burden of production shifts to the Commissioner,

who must demonstrate the claimant is capable of performing other available work in order to deny a claim of disability.  The ALJ must show there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with her medical impairments, age, education, past work experience, and residual functional capacity. The ALJ must analyze the cumulative effect of all the claimant's impairments in determining whether she is capable of performing work and is not disabled.  The ALJ will often seek the assistance of a vocational expert at this fifth step.[25]

If the ALJ determines that a claimant is disabled at any step in the sequence, the

analysis stops.[26]

**Weight Given to Treating Physicians**

"A cardinal principle guiding disability eligibility determinations is that the ALJ

accord treating physicians' reports great weight."[27]  Moreover, such reports will be given

controlling weight where a treating source's opinion on the nature and severity of a

claimant's impairment is well supported by medically acceptable clinical and laboratory

diagnostic techniques and is not inconsistent with the other substantial evidence on

---

[25]  *Plummer*, 186 F.3d at 427.
[26] *See* 20 C.F.R § 404.1520(a)
[27] *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000)

record.[28]

The ALJ must consider medical findings supporting the treating physician's opinion that the claimant is disabled.[29]  If the ALJ rejects the treating physician's assessment, he may not make "speculative inferences from medical reports" and may reject "a treating physician's opinion outright only on the basis of contradictory medical evidence."[30]

However, a statement by a treating source that a claimant is "disabled" is not a medical opinion: rather, it is an opinion on an issue reserved to the ALJ because it is a finding that is dispositive of the case.[31]  Therefore, only the ALJ can make a disability determination.

### Evaluation of Subjective Accounts of Pain[32]

Statements about the symptoms[33] alone never establish the existence of any impairment or disability.  The Social Security Administration uses a two-step process to evaluate existence and severity of symptoms.

### Existence of Pain

First, the ALJ must find a medically determinable impairment – proven with

---

[28] *Fargnoli v. Massanari*, 247 F.3d 34, 43 (3d Cir. 2001).
[29] *Morales v. Apfel*, 225 F.3d 310, 317 (citing *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999)).
[30] *Plummer*, 186 F.3d at 429.
[31] *See* 20 C.F.R. § 416.927 (e)(1).
[32] *See* 20 C.F.R §§ 416.928-29. *See also* SSR 96-7p.
[33] A symptom is an individual's own description of physical or mental impairments such as pain, fatigue, shortness of breath and other complaints.  *See* SSR 96-7p.

medically acceptable clinical and laboratory diagnostic data – that could reasonably be expected to produce the claimant's symptoms.  Otherwise, the ALJ cannot find the applicant disabled, no matter how genuine the symptoms appear to be.

This step does not consider the intensity, persistence and limiting effects of the symptoms on the claimant:  it only verifies whether a medical condition exists that could objectively cause the existence of the symptom.

Analysis stops at this step where the objectively determinable impairment meets or medically equals one listed in 20 CFR Part 404, Subpart P, Appendix 1, because the claimant is considered disabled *per se*.

### Severity of Pain

At step two, the ALJ must determine the extent to which the symptoms limit the claimant's ability to do basic work activities.  Therefore, he must determine the applicant's credibility.[34]

At this step, the ALJ must consider the entire record, including medical signs, laboratory findings, the claimant's statements about symptoms, any other information provided by treating or examining physicians and psychologists, and any other relevant evidence in the record, such as the claimant's account of how the symptoms affect his activities of daily living and ability to work.[35]

Where more information is needed to assess a claimant's credibility, the ALJ

---

[34] Credibility is the extent to which the statements can be believed and accepted as true.

[35] *See* 20 C.F.R. § 404.1529.

must make every reasonable effort to obtain available information that would shed light

on that issue.  Therefore, the ALJ must consider the following factors relevant to

symptoms, only when such additional information is needed:

> (I) The applicants' account of daily activities;
> (ii) The location, duration, frequency, and intensity of pain or other
> symptoms;
> (iii) Precipitating and aggravating factors;
> (iv) The type, dosage, effectiveness, and side effects of any medication the
> applicant takes or has taken to alleviate pain or other symptoms;
> (v) Treatment, other than medication, the applicant receives or has
> received for relief of pain or other symptoms;
> (vi) Any measures the applicant uses or has used to relieve pain or other
> symptoms (e.g., lying flat, standing for 15 to 20 minutes every hour,
> sleeping on a board, etc.); and
> (vii) Other factors concerning functional limitations and restrictions due to
> pain or other symptoms.[36]

### Factors in Evaluating Credibility[37]

A claimant's statements and reports from medical sources and other persons with

regard to the seven factors, noted above, along with any other relevant information in

the record, provide the ALJ with an overview of the subjective complaints, and are

elements to the determination of credibility.

Consistency with the record, particularly medical findings, supports a claimant's

credibility.  Since the effects of symptoms can often be clinically observed, when

present, they tend to lend credibility to a claimant's allegations.  Therefore, the

adjudicator should review and consider any available objective medical evidence

concerning the intensity and persistence of pain or other symptoms in evaluating the

---

[36] *See* 20 C.F.R. § 404.1529
[37] *See* SSR 96-7p.

claimant's statements.

Persistent attempts to obtain pain relief, increasing medications, trials of different types of treatment, referrals to specialists, or changing treatment sources may indicate that the symptoms are a source of distress and generally support a claimant's allegations.  An applicant's claims, however, may be less credible if the level or frequency of treatment is inconsistent with the level of complaints, or if the medical reports or records show noncompliance with prescribed treatment.

Findings of fact by state agency medical and psychological consultants and other physicians and psychologists regarding the existence and severity of impairments and symptoms, and opinions of non-examining physicians and psychologist are also part of the analysis.  Such opinions are not given controlling weight.  However, the ALJ, although not bound by such findings, may not ignore them and must explain the weight afforded those opinions in his decision.

Credibility is one element in determining disability.  The ALJ must apply his finding on credibility in step two of the five-step disability determination process, and may use it at each subsequent step.

The decision must clearly explain –  provide sufficiently specific reasons based on the record – to the claimant and any subsequent reviewers, the weight afforded to the claimant's statements and the reasons therefore.

The law recognizes that the claimant's work history should be considered when

evaluating the credibility of his testimony or statements.[38]   A claimant's testimony is accorded substantial credibility when he has a long work history, if it is unlikely that, absent pain, he would have ended employment.[39]

### Medical Expert Testimony

The onset date of disability is determined from the medical records and reports and other similar evidence, which requires the ALJ to apply informed judgment.[40]   "At the hearing, the administrative law judge (ALJ) should call on the services of a medical advisor when onset must be inferred."[41]

## Parties' Contentions

Plaintiff presents six issues on appeal.   First, plaintiff contends that the ALJ committed legal error by failing to include his mental functional limitations in the RFC assessment when, at the same time, he found that plaintiff suffered from severe depression because he exhibited mental functional limitations.

Second, plaintiff maintains that the ALJ improperly assessed the transferability of his skills.   Specifically, plaintiff argues that his mental functional limitations affected his ability to transfer skills to a new job.   Plaintiff also stresses that his skills and knowledge of computer systems, both software and hardware, are dated and not transferrable due

---

[38] *See* 20 C.F.R. § 404.1529(a)(3)

[39] *See Podedworny v. Harris*, 745 F.2d 210, 217 (3d Cir. 1984) citing *Taybron v. Harris*, 667 F.2d 412, 415 n.6 (3d Cir. 1981).   In *Podedworny*, the claimant worked for thirty-two years as a crane operator for one company.   He had a ninth grade education and left his employment after the company physicians determined that his symptoms of dizziness and blurred vision prevented him from safely performing his job.

[40] *See* SSR 83-20.

[41] *Id.*

to the passage of time.  Plaintiff further asserts that the ALJ failed to consider his advanced age, 57, in assessing that his work skills were transferrable.  Plaintiff maintains that the testimony of the VE is not reliable because the jobs that he identified required significant vocational adjustment time, which, even with transferable skills, exceed the "very little, if any, vocational adjustment" requirement in SSR 82-41. Furthermore, plaintiff contends that the transferrable skill-set identified by the VE is irrelevant because an unskilled individual can learn to perform the semi-skilled jobs identified by the VE in 30 to 45 days.

Third, plaintiff requests remand because the ALJ failed to include all of his limitations in the hypothetical questions to the VE, that is, his mental functional limitations, inability to stand for more than one hour and advanced age.  Because the ALJ failed to properly qualify the VE, his testimony does not constitute substantial evidence and, as a result, the ALJ's opinion does not satisfy step five of the sequential analysis process.

Fourth, plaintiff complains that ALJ failed to use a medical expert, but at the same time, rejected the opinion of plaintiff's treating physician.  Fifth, plaintiff argues that remand is warranted because the ALJ's decision lacked the required analysis under Third Circuit law.  Finally, he maintains that the ALJ violated Third Circuit precedent by failing to consider his more than thirty year work history when evaluating his credibility.

Defendant maintains that the ALJ's findings were consistent with step five of the sequential process, and that the appropriate analysis was used to determine plaintiff's RFC.  Defendant notes that the record is devoid of any mental health treatment or any

other evidence which supports a finding of mental functional limitations.  Although plaintiff

had a medically determinable impairment of depression, the record does not support any

limitations due to that condition.  Defendant points out that plaintiff's own physician failed

to identify any psychological conditions affecting his physical condition.

Moreover, defendant argues that ALJ properly addressed the issue of

transferability of skills, and relied on the expertise of the VE to determine the skills that

were transferrable.  Defendant maintains that the VE could identify plaintiff's transferrable

skill-set based on his testimony, was aware of his advanced age and the passage of time

between the date of last employment and the date of the alleged onset of disability.

Defendant further points out that if plaintiff's computer skills are not transferrable, he has

other skills that are – sales techniques, customer service skills and knowledge of

software and hardware programs.

Defendant notes that the ALJ asked the VE to consider *this* plaintiff when

determining transferability of skills.  Defense further argues that vocational adjustment is

not at issue, because vocational adjustment should only be considered where a claimant

of advanced age is limited to sedentary work:  according to the ALJ, plaintiff retained the

capacity to perform light or sedentary work.  The defense argues that the VE identified

jobs that were consistent with inquiries posed by the ALJ.  Defendant notes that an

inability to stand for more than one hour is not at issue, because the VE identified a

sedentary job which plaintiff could perform, and sedentary work includes the inability to

stand for one hour at a time.

In addition, defendant claims that the ALJ properly discounted the opinion of the

treating physician, which was not entitled to controlling weight because his findings were not supported by acceptable clinical and laboratory diagnostic techniques.  The defense notes that the ALJ, as the fact finder, is responsible to determine the RFC, and is not required to seek a separate medical expert opinion.  Therefore, the ALJ was not required to call an independent medical expert to testify at the hearing.  The defense also dismisses plaintiff's argument that the ALJ's analysis was limited as irrelevant, particularly since the period of eligibility spans only eight months.  Finally, defendant maintains that the ALJ properly assessed plaintiff's credibility, and appropriately considered the relevant evidence, including plaintiff's work history.

In response, plaintiff reiterates that the ALJ found his depression as severe, causing "significant vocationally relevant limitations," and found some mental functional limitations, specifically in the area of social functioning, but failed to account for those limitations in his RFC assessment and failed to include those limitations in his questions to the VE.  Plaintiff claims that if there were no limitations, the ALJ would not have found severe depression.

Further, plaintiff maintains that the hypothetical questions posed by the ALJ to the VE were inadequate and, as a result, the testimony of the VE is not substantial evidence regarding transferrable skills and available jobs.  In those questions, the ALJ failed to include plaintiff's age, a mandatory element in the disability determination, and any mental functional limitations.

**Discussion**

**Application of the Five Step Test**

29

In the instant matter, only step five is at issue, where the Commissioner has the burden of showing that the claimant is capable of performing work that exists in significant numbers locally and nationally and, therefore, is not disabled.  The first four steps are not contested.[42]  To support that the fifth step in the analysis had been met, the ALJ relied on the testimony of the VE who testified that plaintiff has transferrable skills, specifically, his knowledge of computer systems and sales techniques.  The VE concluded that plaintiff could transfer those skills to a sedentary, semi-skilled position in sales or customer service, which included using a computer and communicating by telephone, and identified a number of positions locally and nationally in telephone sales and computer industry retail sales.

**Medical Expert Testimony**

Plaintiff claims that an opinion of a medial expert was required since the period of eligibility occurred more than six years ago and certain evidence is dated after the relevant time period.

The informed judgment standard applies where it is necessary to infer the onset date from the medical evidence and other relevant evidence which describes the medical history and symptomatology.  Inference of the onset date must be made on a legitimate medical basis.  Therefore, at the hearing, the ALJ should use the services of medical advisor when the onset of disability must be inferred.[43]  *Walton* involved a claimant who

---

[42] The findings in the ALJ's opinion noted previously herein and found at paragraphs 1-4, 8 and 9 relate to the first four steps in the five step analysis.

[43] *See Walton v. Halter*, 243 F.3d 703, 708-09 (3d Cir. 2001); *See also* SSR 83-20.

was previously found disabled and who was alleging an earlier disability onset date than

as determined by the Commissioner.  The records of the claimant's treating physician

were no longer available, and that physician was no longer in practice because the

alleged onset of disability date occurred twenty-six years before.  In light of those

circumstances and the regulations, the Third Circuit determined that the services of a

medical expert were necessary to establish the disability onset date.

The facts in the instant matter are distinguishable.  In the present action, no prior

determination of disability had been made and the ALJ was deciding whether plaintiff was

disabled.  Further, the eligibility period occurred only six years ago and all medical

evidence for that time is available and was included in the record.  Therefore, the rule

announced in *Walton* does not apply to present situation.  Moreover, it is the

responsibility of the ALJ to determine plaintiff's RFC.[44]

**Credibility of Plaintiff's Testimony**

Plaintiff's contends that his testimony should be accorded substantial credibility

because of his long work history under the rule in *Podedworny*.[45]  Unlike *Podedworny*,

the facts herein fail to show that plaintiff left his job because he was experiencing

debilitating pain which prevented him from working.  Rather, plaintiff stopped working at

his job because of the "market turn down" and the problems of getting paid by his

employer.  During his thirty year work history, plaintiff was employed by various

---

[44] *See* 20 CFR §§ 404.1527(e), 404.1546. ("the ALJ is responsible for making a residual functional capacity determination . . ., and he is not required to seek separate expert opinion")

[45] *Podedworny v. Harris,* 745 F.2d 210, 217 (3d Cir. 1984).

31

companies.  Moreover, according to the record, plaintiff worked part-time after ending his full-time employment and did not seek treatment until after he stopped working entirely. Therefore, since plaintiff discontinued his employment due to financial problems with his employer, rather than physical pain, the *Podedworny* standard has not been met, and at plaintiff's testimony was not required to be given substantial credibility based on the length of his work history.

### Specificity of the Opinion

Plaintiff contends that the ALJ's opinion is not sufficiently specific to him because it only contains one and a half pages of actual analysis and the rest of the eight page opinion is filled with the ODAR's FIT[46] template

Plaintiff suggests that because there is a "greater specificity" requirement for hypothetical questions to include a claimant's medically supported mental functional limitations, they must also be described with such specificity in the opinion.  Furthermore, plaintiff maintains that *Ramirez v. Berhart*[47] requires a more detailed, individualized assessment of a claimant's functional abilities than what was noted in the decision. *Ramirez*, however, deals with the specificity requirement of hypothetical questions, not with the specificity of the ALJ's opinion.

Contrary to plaintiff's argument, the ALJ's decision provides specific reasons which are supported by the record.  The opinion sets out the relevant facts which only span a

---

[46] The Findings Integrated Templates (FIT) is a SSA initiative which was designed to improve the quality and consistency of the Office of Disability Adjudication and Review (ODAR) decisions. The FIT approach integrates findings of fact into the body of the decision. *See* www.ssa.gov/appeals/fit

[47] 372 F.3d 546 (3d Cir. 2004).

period of eight months, and applies the five-step test wherein the ALJ explained the reasons for his credibility determination.  Therefore, plaintiff's contention that the ALJ failed to satisfy the specificity requirement merely because the ALJ used the FIT standard is without merit.

The decision by the ALJ, however, fails to discuss, as mandated,[48] the findings of the DDS medical consultants in the RFC report, particularly in light of the competing and contrary RFC report by Dr. Esham, plaintiff's treating physician.  As noted previously herein, although the record contains a PRTF, which includes a section on affective disorders,[49] in the absence of any supportive medical history, it was not completed.  Since the decision does not address either DDS's RFC and PRTF[50] reports or Dr. Esham's RFC report, the weight attributed to those assessments is unknown.

Certain conclusions from the DDS RFC report were reproduced in the ALJ's decision.[51]  Although he referenced the DDS report, contrary to the regulations, the ALJ failed to discuss the DDS findings and did not explain the weight applied to that assessment in his opinion.  As a result, his decision fails to explain the bases for his

---

[48] ALJ must consider findings of fact by state agency *medical and psychological* consultants and other program physicians and psychologists about the existence and severity of an individual's impairments, including the existence and severity of any symptoms, and opinions of non-examining physicians and psychologists.  Such opinions are not given controlling weight, but the ALJ, although not bound by such findings, may not ignore them and must explain the weight applied to those opinions in his decision.  *See* 20 C.F.R §§ 416.928-29; *see also* SSR 96-7p.

[49] *See* 42 OASDI Regs, 20 CFR Pt. 404 foll. § 404.1599, T. 20, Ch. III, Pt. 404, Subpt. P, App. 1.  Affective disorders include depressive disorder.

[50] PRTF is the abbreviation for Psychiatric Review Technique Form.

[51] Specifically, the ALJ echoed the non-exertional limitations of the DDS report cautioning that plaintiff "must avoid concentrated exposure to extreme cold and vibrations."

findings and therefore, is not supported by substantial evidence.

**VE Testimony**

Plaintiff further claims that the ALJ failed to include all of his functional limitations when soliciting testimony from the VE.  Therefore, plaintiff argues that the testimony of the VE is inadequate and not substantial evidence to support the ALJ's finding that jobs exist both locally and nationally which plaintiff could perform.

"A hypothetical question must reflect all of claimant's impairments that are supported by the record; otherwise the question is deficient and the expert's answer to it cannot be considered substantial evidence."[52]  An ALJ's question must adequately convey all of a claimant's limitations.[53]  Greater specificity is required when the "ALJ incorporates mental or physical limitations into the hypothetical."[54]

In the present case, the ALJ's decision represents that the VE confirmed that employment existed for an individual having the same age, education, past relevant work experience, and residual functional capacity as plaintiff.  However, the questions posed by the ALJ and subsequent responses by the VE do not support ALJ's findings.

During the hearing, the ALJ asked the following question:

You have heard Mr. Elvin testify about his past work.  And perhaps you can tell me in those vocations what he did and the exertional level and skill level and if he acquired any skills, if you would, please?

---

[52] *Chrupcala v. Heckler*, 829 F.2d 1269, 1276 (3d Cir. 1987).
[53] *Ramirez v. Barnhart*, 372 F.3d 546, 554 (3d Cir. 2004).
[54] *Id.* at 555.

In response, the VE identified the prior work performed by plaintiff as "medium,[55] customarily performed as light.[56]"  The VE also identified plaintiff's knowledge of computer systems, sales techniques, customer service, and software and hardware programs.  In response to the ALJ's inquiry regarding plaintiff's skill level, the VE identified it to be SVP 7 or 8.[57]  Upon further questioning by the ALJ as to the types of jobs consistent with the transferrable skills from plaintiff's prior work experience, the VE identified sedentary positions in retail computer and telephone sales.  The ALJ then asked about the number of positions available in those areas of employment.  That series of questions focused on available employment based on transferability of skills and were not hypothetical questions which "reflect all of claimant's impairments supported by the record."  Whether the questions by the ALJ were hypothetical is irrelevant, because the ALJ must accurately portray nature or extent of the claimant's impairments as contained in the record to the VE when questioning on alternative employment.[58]  Here, the ALJ did not present the VE with any limitations of plaintiff.  Therefore, it is not clear what information or limitations the VE relied on to make his transferability of skills

--------

[55] Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds.

[56] Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.

[57] SVP is an acronym for specific vocational preparation.

[58] *See Wallace v. Secretary of Health and Human Services*, 722 F.2d 1150 (3d Cir. 1983),citing *McGhee v. Harris*, 683 F.2d 256, 259 (8th Cir. 1982) ("It is essential that the record clearly indicate that the vocational expert considered the particular individual disabilities of the claimant in evaluating [his] ability to perform alternative employment."). *See also Jordan v. Heckler*, 835 F.2d 1314, 1316 (10th Cir. 1987) ("A vocational expert may be called for the limited purpose of determining whether the claimant's skills acquired during past work would transfer to a category containing the exertional level the administrative judge concluded the claimant could perform.").

determination and exertional level finding.  Moreover, in response to the hypothetical questions posed by plaintiff's counsel, the VE confirmed that plaintiff could not perform any jobs.  The issue in this case centers whether plaintiff could perform skilled, semi-skilled or unskilled labor.  As the fact finder and decision maker, the ALJ is required to sufficiently qualify a claimant's limitations to the VE.  Otherwise, the testimony of the VE is not substantial evidence which would satisfy element five of the sequential disability determination process.  The failure to clearly indicate on the record that the VE considered the particular disabilities of plaintiff in his analysis warrants remand.

**Omission of Mental Functional Limitations in the RFC Assessment.**

Plaintiff contends that the ALJ committed a legal error by failing to include his finding of mental functional limitations, namely moderate limitations in social functioning, in his RFC assessment and in his questions posed to the VE.

The ALJ may exclude vocationally insignificant mental limitations when posing questions to the VE.[59]  The ALJ determines whether a claimant's mental functional limitations are of vocational significance based on the evidence.[60]  The ALJ, however, is not free to disregard PRTF findings on mental functioning in his RFC assessment, but must only include such findings when those limitations have vocational significance and are supported by substantial evidence.[61]

In *Ramirez*, the ALJ excluded the mental functional limitations contained in the PRTF from his RFC assessment, and did not include them in his questions to the VE.

---

[59] *Ramirez*, 372 F.3d 546 at 555.
[60] *Id*.
[61] *Id*.

Because PRTF findings were significant and supported by sufficient evidence, the court held that ALJ was not free to disregard those limitations.  The plaintiff in *Ramirez* had undergone treatment for an anxiety disorder "with significant symptoms of depression, social phobia, obsessive-compulsive, and mood incongruent hallucinations," and evidenced marked to extreme difficulties in social functioning, and experienced frequent deficiencies in concentration and episodes of deterioration.

In the instant matter, the record clearly demonstrates that plaintiff never underwent any medical treatment for his depression and was never prescribed any anti-depressants. The ALJ only found that plaintiff suffered from 'moderate,' rather than 'extreme,' limitations in social functioning.  Moreover, plaintiff was able to communicate with relatives and friends, use a computer and drive a vehicle short distances.  Such evidence shows that plaintiff's depression was not vocationally significant.

Therefore, the ALJ did not err when he failed to include plaintiff's mental functional limitations in his RFC assessment or in his questions to the VE.

**ORDER AND RECOMMENDED DISPOSITION**

For the reasons contained herein, I recommend that:

(1) Defendant's cross-motion for summary judgment (D.I. 14) be DENIED.

(2) Plaintiff's motion for summary judgment (D.I. 12) be GRANTED.  As a result, remand to address the findings herein is recommended.

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R. Civ. P. 72(b)(1).  The parties may serve and file specific written objections within

ten (10) days after being served with a copy of this Report and Recommendation.  Fed.

R. Civ. P. 72(b).

The parties are directed to the Court's standing Order in Non-Pro Se matters for

Objections Filed under Fed. R. Civ. P. 72, dated April 7, 2008, a copy of which is

available on the Court's website, www.ded.uscourts.gov.

August 14, 2009                          /s/ Mary Pat Thynge
                                         UNITED STATES MAGISTRATE JUDGE